12/03/2012 14:37 FAX  408 293 9056      Knox Services KSJ                      ☒006/052

ADR

E-filing

Filed

DEC - 3 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

160 #

1  JOHNSON & WEAVER, LLP
   Frank J. Johnson (174882)
2  frankj@johnsonandweaver.com
   Brett Weaver (204715)
3  brett@johnsonandweaver.com
   110 West "A" Street, Suite 750
4  San Diego, California 92101
   Telephone: (619) 230-0063
5  Facsimile: (619) 255-1856

6  *Attorneys for Plaintiff Martin Bertisch*

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  MARTIN BERTISCH, derivatively on          Case No.:
    behalf of HEWLETT-PACKARD
11  COMPANY,                                  CV 12-06123  HRL

12          Plaintiff,                        **VERIFIED SHAREHOLDER
                                              DERIVATIVE COMPLAINT**
13     v.
                                              DEMAND FOR JURY TRIAL
14  LEO APOTHEKER, CATHERINE A.
    LESJAK, MARC L. ANDREESSEN,
15  LAWRENCE T. BABBIO, JR, SARI M.
    BALDAUF, SHUMEET BANERJI,
16  RAJIV L. GUPTA, JOHN H.
    HAMMERGREN, RAYMOND J. LANE,
17  ANN M. LIVERMORE, GARY M.
    REINER, PATRICIA F. RUSSO,
18  DOMINIQUE SENEQUIER, G.
    KENNEDY THOMPSON, MARGARET
19  C. WHITMAN, RALPH V.
    WHITWORTH, MICHAEL LYNCH,
20  JAMES T. MURRIN, SHANE ROBISON,
    KPMG LLP, PERELLA WEINBERG, and
21  BARCLAYS CAPITAL

22          Defendants,

23  -and-

24  HEWLETT-PACKARD COMPANY, a
    Delaware corporation,
25
            Nominal Defendant.
26

27

28
───────────────────────────────────────────────
             VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.      This is a verified shareholder derivative action on behalf of nominal defendant Hewlett-Packard Company ("Hewlett-Packard," "HP" or the "Company") arising out of the Company's August 2011, $11. billon acquisition of British software firm, Autonomy Corp., and subsequent write down of $8.8 billion based on Autonomy's allegedly fraudulent accounting practices.

2.      The New York Times has called HP's Autonomy fiasco possibly "the worst corporate deal ever." *See* James Stewart, *H.P.'s Blunder for the Record Books*, *N.Y. Times*, November 30, 2012. Unfortunately, the Autonomy fiasco was just the latest in a "cavalcade of costly blunders at HP." *See* Micheal Liedtke, *HP's Automony Deal Highlights Patters of Bad Ideas*, Associated Press, November 20, 2012. In the previous few years, HP had squandered billions of dollars on ill-advised acquisitions. In fact, just months before writing down $8.8 billion on the Autonomy acquisition, HP wrote down nearly $1 billion in connection with its failed acquisition, Palm, Inc. and another $8 billion for its failed acquisition of Electronic Data Systems Corp.

3.      Notably, most observers were critical of the Autonomy deal from the very beginning. *See* Cromwell Schubarth, *Analyst: HP investors 'exasperated,' oppose Autonomy deal*, San Jose Business Journal, September 14, 2011. Indeed, questions about the credibility of Autonomy's books had surfaced as early as 2009 when renowned short seller Jim Chanos identified multiple red flags with Autonomy's financials. *See* Porrima Gupta, et al., *Insight: How a desperate HP suspended disbelief for Autonomy deal*, Reuters, November 30, 2012. Moreover, Autonomy's founder, Michael Lynch, had previously shopped the company to Oracle Inc. claiming the company was worth $6 billion. But according to one Oracle executive: "We couldn't figure out where the numbers came from. And taking the numbers at face value, even at $6 billion it was overstated." *See HP's Blunder One For the Records Books*, supra. Further, Oracle's CEO Larry Ellison said that Autonomy's asking price was "absurdly high" and publicly questioned Lynch's honesty. *See* Cromwell Schubarth, *HP's Autonomy deal: Story keeps getting worse*. San Jose Business Journal, November 20, 2012.

1

1    Even worse, HP's own CFO, Cathy Lesjak, was so vociferous in her opposition to the
2    Autonomy deal that she was reportedly concerned about being fired. *Id.*

3        4.    Nonetheless, HP's Board of Directors went ahead with the acquisition anyway.
4    HP's then CEO Defendant Léo Apotheker — who spearheaded the deal — assured investors
5    that "Autonomy will be, on Day 1, accretive to HP." In truth, HP's acquisition of Autonomy
6    was a disaster from the start.

7        5.    Indeed, HP's Board fired Apotheker even before the Autonomy deal closed. His
8    successor, Defendant Margaret ("Meg") Whitman — who approved the deal as a member of
9    HP's Board — continued to press the lie that the Autonomy deal would be good for HP.
10   Within months, however, she terminated Lynch based on Autonomy's poor performance.

11       6.    Then, on November 20, 2012, Whitman announced that Hewlett-Packard had
12   written down $8.8 billion in connection with the Autonomy acquisition. According to
13   Whitman, more than $5 billion of the write down was caused by a "willful effort on behalf of
14   certain Autonomy employees to inflate the underlying financial metrics of the company in
15   order to mislead investors and potential buyers." Lynch, however, has publicly rejected
16   Whitman's accusations. Moreover, several analysts have called her accusations "due diligence
17   deflection." According to Mark Williams, a finance professor at Boston University and former
18   bank examiner for the Federal Reserve, "[j]ust to say 'we paid too much because of fraud'
19   doesn't negate the fact of inadequate due diligence." *See HP's Autonomy deal highlights a*
20   *pattern of bad ideas*, supra. Other observers have questioned whether HP's Board is
21   overstating Autonomy's supposed "accounting chicanery" as a way to deflect the fact that it
22   paid way too much for Autonomy. *See* Peter Eavis, *Some Analysts Question Numbers in*
23   *H.P.'s Write-Down*, November 21, 2012.

24       7.    Even worse, despite knowing about the problems with the Autonomy
25   acquisition, HP's Board caused the Company to repurchase over $1.6 billion of the Company's
26   stock in an effort to keep HP's stock artificially inflated. When the truth came out, however,
27   HP's stock price plummeted 12 percent — the sixth-worst one-day decline in the Company's
28

1   history. Tellingly, the biggest one-day collapse in HP' stock price came in August 2011 when
2   it sank 20% on the day it announced its acquisition of Autonomy.

3        8.    Today, Hewlett-Packard's stock is trading at a ten-year low and some are
4   questioning whether the Company will even survive. Several analysts have said the reason for
5   this is simple: "The problem for HP is that it has a pretty crummy board." *See* Morgan Korn,
6   *HP's Downfall? Look to Its Board*, Yahoo! Finance, November 30, 2012. Many observers
7   have argued that an "overhaul of the board is necessary." *See* Mark Rogers, *HP: Time For*
8   *Meg To Go*, Forbes, November 30, 2012. One analysts has gone so far as to call "HP an
9   unmitigated train wreck." *See HP's Atunomy deal highlights a pattern of bad ideas*, supra.
10  According to Boston University management professor, James Post, "[o]nce again H-P is a
11  company in trouble and once again their problems are due to ethics and governance issues."
12  *See* Therese Ploetti, *H-P Can This Company Be Saved*, The Wall Street Journal Market Watch,
13  November 23, 2012.

14       9.    Accordingly, Plaintiff Lynn Layman brings this lawsuit against some of HP's
15  current and former officers and directors for the false statements they made in connection with
16  HP's acquisition of Autonomy between August 2011 and November 2012 (the "Relevant
17  Period"). Plaintiff also brings this action against HP's Board of Directors based on their
18  breach of fiduciary duties with respect to the due diligence, or lack thereof, that they
19  conducted in connection with the Autonomy acquisition. Plaintiff also brings this action
20  against HP's financial advisors for their failures in spotting the numerous red flags concerning
21  Autonomy's and against Lynch for aiding and abetting the HP's director's breaches of their
22  fiduciary duties. Plaintiff seeks to: (a) recover damages against the Individual Defendants for
23  the benefit of the Company and (b) require the Company to reform and improve its corporate
24  governance and internal procedures to better protect the Company and its shareholders from a
25  repeat of the damaging events described below.

26                          **JURISDICTION AND VENUE**
27       10.   This Court has jurisdiction in this case under 28 U.S.C. §1331 because it
28  includes claims arising under the Securities Exchange Act of 1934 (the "Exchange Act"). This

3

Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     A true and correct copy of this Complaint was delivered to HP before it was filed with the Court.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to HP occurred in this District, and defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. HP has a substantial presence in California, including maintaining offices at 3000 Hanover Street, Palo Alto, CA 94304, 2125 E. Katella Avenue, Anaheim, California 92806, and 15355 Barranca Parkway, Irvine, California 92618, and each of the Individual Defendants has had contacts with California as a director and/or officer of HP, making exercise of personal jurisdiction over them proper.

13.     This Court retains general jurisdiction over each named defendant who is a resident of California. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants have sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Defendants' conduct was purposefully directed at California and arose in California, where HP maintains its corporate headquarters. Exercising jurisdiction over the named non-resident defendants is therefore reasonable.

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## THE PARTIES

**Plaintiff**

14.     Plaintiff Martin Bertisch currently owns and has owned HP stock at all times relevant to this complaint.

**Nominal Defendant**

15.     Nominal defendant Hewlett-Packard Company ("Hewlett-Packard" or "HP") is a Delaware corporation with its principal executive offices located at 3000 Hanover Street, Palo Alto, California.  HP is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.  HP is a provider of products, technologies, software, solutions, and services to individual consumers, small- and medium-size businesses, and large enterprises, including customers in the government, health, and education sectors.

**Defendants**

16.     Defendant Léo Apotheker ("Apotheker") was HP's CEO, President, and a director from November 2010 until his termination on September 22, 2011. For less than a full year of employment, marked by a succession of reckless, negligent, and ultimately disastrous decisions, as well as continuous false and misleading statements to investors, Apotheker took in over $30 million in compensation from HP. Apotheker is also named as a defendant in a related securities class action alleging that he violated sections 10(b) and 20(a) of the Exchange Act.

17.     Defendant Marc L. Andreessen ("Andreessen") is an HP director and has been since 2009.  Andreessen is also Chairman of HP's Technology Committee and has been since at least January 2010.

18.  .  Defendant Ann M. Livermore ("Livermore") is an HP director and the Interim Executive Vice President of HP Enterprise Services and has been since June 2011.

19.     Defendant Catherine A. Lesjak ("Lesjak") is HP's Executive Vice President and Chief Financial Officer and has been since January 2007. During the Relevant Period, Defendant Lesjak was paid $9.9 million in incentive- and stock-based compensation.  Lesjak is

named as a defendant in a related securities class action that alleges she violated sections 10(b) and 20(a) of the Exchange Act.

20.     Defendant Lawrence T. Babbio, Jr. ("Babbio") was an HP director from at least 2002 until March 2012.  Babbio was a member of HP's Audit Committee from January 2012 to March 2012 and a member of the Finance and Investment Committee from February 2011 to at least September 2011.

21.     Defendant Sari M. Baldauf ("Baldauf") was an HP director from 2006 until March 2012, and a member of HP's Audit Committee starting in January 2010.  Baldauf was also a member of HP's Technology Committee from at least January 2010.

22.     Defendant Shumeet Banerji ("Banerji") is an HP director and has been since February 2011. Banerji is also a member of HP's Audit Committee and has been since February 2011.

23.     Defendant Rajiv L. Gupta ("Gupta") is an HP director and has been since 2009. Gupta is also a member of HP's Audit Committee and has been since at least September 2011. Gupta was a member of HP's Technology Committee from at least January 2010

24.     Defendant John H. Hammergren ("Hammergren") is an HP director and has been since 2005.  Hammergren is also Chair of HP's Finance and Investment Committee and has been a member of that committee since February 2011.

25.     Defendant Raymond J. Lane ("Lane") is HP's Chairman of the Board and has been since November 2010.  Lane was Chairman from November 2010 to September 2011 and Executive Chairman since September 2011.

26.     Defendant Gary M. Reiner ("Reiner") is an HP director and has been since January 2011.  Reiner is also a member of HP's Technology Committee and has been since March 2011.

27.     Defendant Patricia F. Russo ("Russo") is an HP director and has been since January 2011.  Russo is also a member of HP's Technology Committee and has been since March 2011.

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28.     Defendant Dominique Senequier ("Senequier") was an HP director from January 2011 until March 2012.  Senequier was also a member of HP's Audit Committee beginning in February 2011.

29.     Defendant G. Kennedy Thompson ("Thompson") is an HP director and has been since 2006.  Thompson is a member of HP's Audit Committee and has been since at least January 2010, and has been Chairman of the Audit Committee since at least September 2011.

30.     Defendant Margaret C. Whitman ("Whitman") is an HP director and has been since January 2011.  Whitman has served as HP's President and Chief Executive Officer since September 2011. Whitman is also a member of HP's Technology Committee and has been since March 2011.  Whitman signed the Company's SEC filings and participated in conference calls with analysts and investors during the Relevant Period.

31.     Defendant Ralph V. Whitworth ("Whitworth") has been a director since 2011. Whitworth is also a member of HP's Finance and Investment Committee.

32.     Defendant James T. Murrin ("Murrin") was the Company's Senior Vice President, Chief Accounting Officer and Controller from the beginning of the Relevant Period through May 1, 2012.  During the Relevant Period, Murrin sold 132,500 shares of his Hewlett-Packard stock for proceeds of nearly $3.5 million while in the possession of materially adverse and non-public information.

33.     Defendant Shane V. Robison ("Robison") was HP's Executive Vice President and Chief Strategy and Technology Officer from May 2002 to November 2011. Defendant Robison was closely involved in both the acquisition of, and false and misleading statements regarding, both the acquisitions described herein. During 2011, a period that included disastrous acquisitions and plummeting market capitalization, Robison took over $9 million in compensation from HP.

34.     Defendant Mike Lynch ("Lynch") was the Chief Executive Officer of Autonomy prior to its acquisition, and became HP's Executive Vice President for Information Management, responsible for operations in the former Autonomy unit, from November 2011

7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

until May 2012. Lynch was directly involved in financial reporting for Autonomy, both pre- and post-merger, and therefore directly implicated in the conduct described herein.

35.     Defendant KPMG LLP ("KPMG") is a member firm of KPMG International, a "Big Four" accounting firm, that performed financial and accounting due diligence for HP with respect to the proposed Autonomy acquisition.  KPMG is a limited liability partnership with principal offices at 345 Park Avenue, New York NY.

36.     Defendant Perella Weinberg is a United Kingdom limited liability partnership with principal offices located at 20 Grafton Street, London, United Kingdom. Perella Weinberg served as a financial advisor to HP with respect to the Autonomy acquisition, and received $12 million in connection with that work.

37.     Defendant Barclays Capital is an investment banking broker and financial advisor and served HP in those capacities in connection with the Autonomy acquisition. Barclays Capital was paid over $18 million for its role in the acquisition. Barclays Capital has principal offices at 5 North Colonnade, Canary Wharf, London, United Kingdom.

38.     Defendants Apotheker, Livermore, Murrin and Lesjak are sometimes referred to collectively herein as the "Officer Defendants."

39.     Defendants Baldauf, Banerji, Gupta, Senequier, and Thompson are sometimes referred to collectively herein as the "Audit Committee Defendants."

40.     Defendants Andreessen, Baldauf, Gupta, Reiner, Russo, and Whitman are sometimes referred to collectively herein as the "Technology Committee Defendants".

41.     Defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth are sometimes referred to collectively herein as the "Finance and Investment Committee Defendants".

42.     Defendants Apotheker, Livermore, Whitman, Andreessen, Baldauf, Banerji, Gupta, Hammergren, Lane, Reiner, Russo, Senequier, and Thompson are sometimes referred to collectively herein as the "Director Defendants."

43.     Defendants KPMG, Perella Weinberg, and Barclays Capital are sometimes referred to collectively herein as the "Financial Advisor Defendants".

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

44.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitman, and Whitworth are sometimes referred to collectively herein as the "Current Board."

45.    Defendants Apotheker, Livermore, Lesjak, Murrin, Whitman, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Murrin, Reiner, Russo, Senequier, Thompson and Whitworth are sometimes referred to collectively herein as the "Individual Defendants."

46.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hewlett-Packard's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

47.    The Financial Advisor Defendants, because of the roles and duties they assumed in HP's acquisition of Autonomy, are responsible for failing to discharge those duties in a conscientious manner. The Financial Advisor Defendants, along with each of the Individual Defendants, consciously disregarded numerous red flags that had been available since at least 2009 that either did or with the exercise of reasonable diligence should have alerted them to serious irregularities in Autonomy's accounting practices.

48.    Defendant Apotheker specifically stated that Hewlett-Packard did "meticulous and thorough" due diligence prior to closing the Autonomy acquisition. Apotheker described

1  Autonomy as a "very important asset" and stated that "Autonomy will be, on day one,

2  accretive to HP."

3     49.   An $8.8 billion dollar write-down on a $10.2 billion investment is not what a

4  prudent investor would reasonably expect from an important asset, "accretive" on "day one."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

7     50.   By reason of their positions as officers, directors, and fiduciaries of HP and

8  because of their ability to control the business and corporate affairs of HP, the Individual

9  Defendants at all times relevant to this action owed HP and its shareholders fiduciary

10  obligations of trust, loyalty, good faith, and due care, and were at all times relevant to this

11  action required to use their utmost ability to control and manage HP in a fair, just, honest, and

12  equitable manner.  The Individual Defendants were required to act in furtherance of the best

13  interests of HP and its shareholders so as to benefit all shareholders equally and not in

14  furtherance of any individual personal interest or benefit.

15     51.   Each officer and director of the Company owed to HP and its shareholders the

16  fiduciary duty to exercise good faith and due diligence in the administration of the affairs of

17  the Company and in the use and preservation of its capital, property and assets, and the highest

18  obligations of fair dealing.   In addition, as officers and/or directors of a publicly held

19  company, the Individual Defendants had a duty to promptly disseminate accurate and truthful

20  information with regard to the Company's operations, performance, management, projections,

21  and forecasts so that the market price of the Company's stock would be based on truthful and

22  accurate information.

**Additional Duties of the Audit Committee Defendants**

24     52.   In addition to these duties, under its Charter in effect since 2010, the Audit

25  Committee Defendants, defendants Baldauf, Banerji, Gupta, Senequier, and Thompson, owed

26  specific duties to HP to review and approve the Company's earnings press releases, guidance,

27  and quarterly and annual financial statements.  The Audit Committee's Charter provides in

28  relevant part that the Committee is required to, among other responsibilities:

10
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Meet to review and discuss with management and the independent registered
     public accounting firm HP's annual audited and quarterly financial statements,
2    including HP's disclosures in "Management's Discussion and Analysis of
     Financial Condition and Results of Operations."
3
                                   *   *   *
4
     Earnings Press Releases, Corporate Policies and Earnings Guidance. The
5    Committee will review and discuss earnings press releases (paying particular
     attention to the use of "pro forma," or "adjusted" non-GAAP information), as
6    well as corporate policies with respect to financial information and earnings
     guidance provided to analysts and ratings agencies.
7
                                   *   *   *
8
     Internal Controls. The Committee will review the adequacy and effectiveness of
9    HP's internal controls, including any significant deficiencies in such controls
     and significant changes or material weaknesses in such controls reported by the
10   independent registered public accounting firm, the internal auditors or
     management, any special audit steps adopted in light of material control
11   deficiencies, and any fraud, whether or not material, that involves management
     or other HP employees who have a significant role in such controls.
12

**Additional Duties of the Technology Committee Defendants**

13

14        53.    In addition to the duties listed above, under the Charter in effect since 2010, the

15   Technology Committee Defendants, defendants Andreessen, Baldauf, Gupta, Reiner, Russo,

16   and Whitman, owed specific duties to HP to assess the Company's technology development

17   strategies and the scope and quality of HP's intellectual property.

18        The Company describes the Technology Committee's duties as:

19

20        The Technology Committee makes recommendations to the Board as to scope,
          direction, quality, investment levels and execution of HP's technology
21        strategies; oversees the execution of technology strategies formulated by
          management; provides guidance on technology as it may pertain to, among
22        other things, market entry and exit, investments, mergers, acquisitions and
          divestitures, new business divisions and spin-offs, research and development
23        investments, and key competitor and partnership strategies; and reviews and
          makes recommendations on proposed investment, acquisition, joint venture and
24        divestiture transactions with a value of at least $200 million that involve
          technology prior to any review by other Board Committees or the Board
25        pursuant to HP's M&A approval policies.

26        54.    The Technology Committee Defendants therefore would have had, or with the

27   exercise of due care should have had, specific knowledge about the Company's acquisition of

28

                                            11
                 VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Autonomy, its touted search technology, and the lack of organic growth in market penetration by the technology.

**Additional Duties of the Finance and Investment Committee Defendants**

55.    In addition, the Finance and Investment Committee Defendants, Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson and Whitworth, owed specific duties to HP to provide oversight of the Company's finance and investment functions. These defendants had specific responsibilities to HP to assist the board in evaluating and to provide oversight of proposed investments and acquisitions including the proposed acquisition of Autonomy. These defendants failed to fulfill their fiduciary duty to the Company to provide adequate oversight of that acquisition.

**Access, Control, and Authority**

56.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

57.    Because of their advisory, executive, managerial, and directorial positions with HP, each of the Individual Defendants had access to adverse, material, non-public information about the financial condition, operations, and growth prospects of HP, including information regarding HP's acquisition of Autonomy and the glaring weaknesses in accounting processes, accounting statement accuracy, and declining margins and lack of growth prospects for the business.

58.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HP, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

59.    To discharge their duties, the officers and directors of HP were required to exercise reasonable and prudent supervision over the management, policies, practices, and

1    controls of the financial affairs of the Company.  By virtue of such duties, the officers and

2    directors of HP were required to, among other things:

3         - properly and accurately guide investors and analysts as to the true financial condition
          of the Company at any given time, including making accurate statements about the
4         Company's financial health;

5         - ensure that the Company complied with its legal obligations and requirements,
          including acting only within the scope of its legal authority and disseminating truthful
6         and accurate statements to the investing public;

7         - refrain from acting upon material, inside corporate information to benefit themselves;

8         - conduct the affairs of the Company in an efficient, business-like manner so as to
          make it possible to provide the highest quality performance of its business, to avoid
9         wasting the Company's assets, and to maximize the value of the Company's stock;

10        - remain informed as to how HP conducted its operations, and, upon receipt of notice
          or information of imprudent or unsound conditions or practices, make reasonable
11        inquiry in connection therewith, and take steps to correct such conditions or practices
          and make such disclosures as necessary to comply with securities laws; and
12
          - ensure that the Company was operated in a diligent, honest, and prudent manner in
13        compliance with all applicable laws, rules, and regulations.

14                                   **FACTUAL ALLEGATIONS**

15

16   **HP's Board Hires A CEO Without Ever Meeting Him**

17        60.    In August 2010, HB's Board terminated CEO Mark Hurd for having an

18   inappropriate relationship with a female contractor. It then formed a special Search Committee

19   to identify potential candidates for CEO.   Reportedly to "infighting" and interpersonal

20   animosities, the Board refused to interview or even meet any of the candidates that the Search

21   Committee provided, however.

22        61.    Instead, the Board hired Defendant Apotheker as HP's CEO.   Apotheker's

23   appointment as CEO was greeted with head scratching and criticism.  He had no obvious

24   qualifications to run HP.  He previously had been the CEO of German software maker SAP, a

25   company much smaller than HP, and he had no experience in the computer hardware business.

26   Moreover, SAP's board fired him after just ten months on the job.  Indeed, his only apparent

27   qualification appears to be that HP's Chairman, Defendant Lane, had worked with him before

28   and wanted to work with him again.  Several HP Board members admitted that they voted to

1   hire Apotheker without ever meeting him.  "I admit it was highly unusual," one of the board

2   members told the New York Times. "But we were just too exhausted from all the infighting."

3   **HP's "Desperate" Purchase Of Autonomy**

4   62.   In late 2010, HP was reeling from a series of corporate embarrassments.  Five

5   years before Hurd's sexual-harassment scandal, HP was caught spying on journalists who

6   covered the Company.  In addition, the Company had wasted tens of billions of dollars on its

7   failed acquisitions of Compaq, Palm and EDS.

8   63.   As his first order of business, HP's Board had given Apotheker the mandate of

9   moving the lumbering company away from its low-margin computer hardware business and

10  into the lucrative software and services arena.  After being rebuffed by software companies

11  Comverse Technology and Amdocs, Apotheker set his sights on Autonomy.

12  64.   After two months of negotiations on what was known at HP as "Project Tesla,"

13  Authoker and Lynch shook hands on what would become an $11.1 billion deal.  Lane, who

14  Apotheker had consulted with closely through the process, encouraged HP's Board to approve

15  the deal.

16  65.   Notably, Defendant Lesjak, HP's former interim CEO and current CFO, was

17  implacably opposed to the Autonomy deal and spoke out internally.  According to a May 2012

18  account in Fortune Magazine, which HP has not disputed, Lesjak made an impassioned

19  presentation to the Board saying "I don't think it's a good idea.  I don't think we're ready.  I

20  think it's too expensive. I'm putting a line down.  This is not in the best interests of the

21  company."  Lesjak was so vociferous in her opposition that one person who spoke with her

22  that day said she was afraid she would be fired for being so outspoken.

23  66.   Lesjak had been intimately involved in the due diligence process and, thus, was

24  in a much better position than the Board to understand the problems with Autonomy.

25  Nevertheless, on August 18, 2011, HP's Board unanimously voted to acquire all of

26  Autonomy's outstanding shares for $42.11 per share in cash.  Tellingly, a week after the deal

27  was announced, Lesjak refused to appear at a road show where she was supposed to defend the

28  deal and its terms.

14
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

67.     In voting to approve the deal, HP's Board deliberately ignored numerous "red flags" in Autonomy's accounting and business practices. These red flags include, but are not limited to, the following:

### 1.     Autonomy's Reported Way Too Much In Receivables

68.     The audited financial statements that HP reviewed showed that Autonomy had booked sales at $870 million, receivables at $330 million, and deferred revenue at $177 million. The amount of receivables, which is a debt a company is owed and expects to be paid, was "really perverse" for a software company. *See* Arik Hesseldahi, *The Red Flags That Were Obvious — To Some — In the HP-Autonomy Deal*, All Things Digital, November 21, 2012. Indeed, software companies tend to have very few receivables.

69.     The reason for this is that software is usually sold for cash up front and then further payments tend to come from providing service and support or ongoing subscription fees. But the customer could go out of business, cancel the subscription or simply stop paying. As such, the expected future payments can't be counted as a receivable and in fact have to be accounted for as a liability, essentially money that might be lost.

70.     Autonomy was booking as income lots of cash it had not received (which is why the receivables were large) and not booking an obligation to provide future services for that income. The Individual Defendants either missed, or more likely ignored, this glaring problem with Autonomy's basic applied accounting.

### 2.     Autonomy's operating margins were way too high to make sense

71.     Software companies increase their margins by boosting the number of companies they sell to. The more customers they have, the more they can amortize their research and development costs, which is essentially the only real costs associated with creating software. However, R&D costs do not normally recur with an increase in customer base.

72.     Autonomy's reported operating margins were only 15% in 2005. By early 2010, however, they had grown to 50%. The Individual Defendants knew or recklessly

1   ignored the fact that Autonomy's operating margins were growing substantially and

2   suspiciously faster than its relatively small customer base.

3                  **3.   A former Autonomy insider complained Autonomy's accounting**

4                       **practices**

5        73.   According to a November 26, 2012 *Wall Street Journal Article* titled, "Long

6   Before H-P Deal, Autonomy's Red Flags," a U.S. executive for Autonomy pointed out in 2010

7   what he thought were problematic accounting practices to his superiors.  That executive was

8   eventually fired and he took his complaints to Autonomy's outside auditors, the SEC and

9   regulators in the U.K.  According to a spokesman for defendant Lynch, this information came

10  up during HP's purported due diligence process.

11                 **4.   Hedge fund investors, journalists and analysts questioned**
                        **Autonomy's suspicious accounting practices**

12       74.   As early as October 2009, numerous outside observers were publicly noting

13  their suspicions about Autonomy's accounting practices.  The following are just a few

14  examples:

15       75.   On October 31, 2009, the London Daily Telegraph quoted analysts' complaints

16  that Autonomy did not allow investment analysts to ask any difficult questions regarding the

17  company's financial results. In just one suspect deal in July 2009, Autonomy sold $9 million

18  worth of software to VMS Information, a New York firm, and immediately recognized this

19  amount as top-line revenues. This deal, however, had apparently been part of a quid-pro-quo

20  transaction in which Autonomy actually bought $13 million worth of VMS data products in

21  exchange for the $9 million sale. Autonomy misleadingly booked this $13 million purchase as

22  a "sales and marketing" expense. VMS went bankrupt soon afterward, owing Autonomy $6.4

23  million of the promised $9 million purchase.

24       76.   In July 2009, renowned short seller James Chanos published a detailed report

25  arguing that Autonomy's deferred revenue appeared too low for a software company.  He

26  further added that Autonomy might have masked its underperformance with acquisitions.

27       77.   In January, 2010, the Financial Times reported that significant questions were

28  circulating regarding the quality of earnings reported by Autonomy, particularly as Autonomy

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    had grown so rapidly by acquisitions of its own, and had folded the acquired revenues into its

2    operating results in 14 of the previous 16 quarterly earnings reports.

3          78.      In July 2010, financial analysts specifically questioned Autonomy's reported

4    sales growth rate for its flagship product.  Former Apple CEO John Sculley commented

5    regarding Autonomy's  growth and revenue recognition practices, in the context of  the HP

6    acquisition, that, "These are the things that any experienced operating executive would be

7    asking about."

8          **5.      Oracle Publically Questioned Autonomy's Numbers and Lynch's**
            **Veracity**
9

10         79.      As HP was in the process of acquiring Autonomy for $11.1 billion, Oracle

11   CEO, Larry Ellison, disclosed that investment banker Frank Quattrone and defendant Lynch

12   had "shopped" Autonomy to him.  Ellison stated that he "had taken a pass" and that the

13   amount that HP had agreed to pay was "absurdly high."

14         80.      Immediately after Ellison's public statement, Lynch issued a denial that he had

15   shopped Autonomy to Oracle.  In a press release entitled "Another Whopper from Autonomy

16   CEO Mike Lynch," Ellison detailed multiple meeting that occurred between Oracle's and

17   Autonomy's mergers and acquisitions teams.  When Lynch tried to explain that he wasn't at

18   these meetings "to sell anything," Ellison published the PowerPoint slides that Lynch had

19   provided to Oracle in an attempt to induce it to purchase the company.  Notably, these

20   PowerPoint Slides valued Autonomy at $5.7 billion.  One Oracle executive who was at the

21   meetings said that Autonomy was overvalued at this amount even if you accepted these

22   numbers as true.

23         81.      Despite Oracle's clear opinion that Autonomy was not worth anywhere near

24   $11.1 billion — and Lynch's obvious lies about his meetings with Oracle — HP's Board went

25   ahead with the sale anyway.

26   **HP Hides The Fact That It Overpaid By Exaggerating The Amount Of Autonomy's**
     **Good Will**

27         82.      When HP agreed to acquire Autonomy, Autonomy listed $3.5 billion of total

28   assets on its balance sheet, but net tangible assets of just $80.2 million as of June 30, 2011.  To

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  make up the difference between the $80.2 million in net tangible assets, and $11.1 billion

2  purchase price, HP recorded $6.9 billion of goodwill and $4.6 billion in amortizable purchased

3  intangible assets. Of course, HP has now written down $5.5 dollars based on Autonomy's

4  supposed accounting chicanery. Many are questioning whether HP's Board is using

5  Autonomy's alleged fraud to deflect the fact that it paid way too much for the company.

6                          **THE FALSE AND MISLEADING STATEMENTS**

7       83.    On August 18, 2011, Hewlett-Packard announced its intention to acquire

8  Autonomy in a $11.1 billion transaction. The release stated in part:

9       "Autonomy presents an opportunity to accelerate our strategic vision to
        decisively and profitably lead a large and growing space," said Léo Apotheker,
10      HP president and chief executive officer. "Autonomy brings to HP higher value
        business solutions that will help customers manage the explosion of
11      information. Together with Autonomy, we plan to reinvent how both
        unstructured and structured data is processed, analyzed, optimized, automated
12      and protected. Autonomy has an attractive business model, including a strong
        cloud based solution set, which is aligned with HP's efforts to improve our
13      portfolio mix. We believe this bold action will squarely position HP in software
        and information to create the next-generation Information Platform, and
14      thereby, create significant value for our shareholders."

15  According to the press release, Apotheker continued,

16      "Autonomy is a highly profitable and globally respected software company,
        with a well-regarded management team and talented, dedicated employees. We
17      look forward to partnering with a company who shares our commitment to
        solving customer problems by creating smart, cutting-edge products and
18      solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of
        brilliant scientists and employees, will continue to lead Autonomy. I look
19      forward to our collaboration as we focus on creating maximum value for the
        combined company, its customers and employees."
20

21      84.    On or about September 13, 2011, defendants Lesjak and Murrin caused

22  Hewlett-Packard to file a prospectus on Form 424B5 with the SEC for the offer and sale of

23  $4.6 billion in fixed- and floating-rate notes with maturities reaching out to September 14,

24  2041. The prospectus informed investors that the proceeds of the $4.6 billion offering would

25  be "for general corporate purposes." The September 13, 2011 prospectus incorporated by

26  reference management's discussion and analysis of the Services segment's financial

27  performance as reported in the Company's third quarter 2011 Form 10-Q, which stated in

28  relevant part:

                                         18
                    **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Services net revenue increased 3.6% (decreased 1.9% when adjusted for currency) and 1.0% (decreased 1.4% when adjusted for currency) for the three and nine months ended July 31, 2011, respectively. Infrastructure Technology Outsourcing net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology Services net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Application Services net revenue increased by 2% and 1% for the three and nine months ended July 31, 2011, respectively. The increase for both periods was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

85. Also on September 13, 2011, the Company's former CEO participated in the following Q&A with analyst Chris Whitmore at the Deutsche Bank Technology Conference:

[APOTHEKER:]    Autonomy – I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in San Francisco. We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, *Autonomy is a very important asset.*

\*       \*       \*

And let me just try to build on that and help you understand how we came to the valuation of Autonomy. *We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.* Just to make sure everybody understands. *Autonomy will be, on day one, accretive to HP.* For FY 2012, Autonomy, once we integrate it, is accretive to HP.

Now, we have identified five synergy possibilities – five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy. And I can walk you through that, through these various elements. *But just take it from us. We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders.*

\*       \*       \*

[WHITMORE:]    You're in the midst of repositioning [Enterprise Services]. Can you talk about where you are today in that process, what the end goal is? What do you hope to turn EDS into?
[APOTHEKER:]    Okay. It's not EDS anymore; it's HP Enterprise Services. And the segment we report is that business, our enterprise services, and our technical services. We bring it all together in the segment service that you see in the reporting.

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

So, what are we trying to do? Currently, our HP EDS -- former EDS business is heavily skewed towards outsourcing. We are trying to shift this balance over time and it has to be gradual, because in service businesses, things move gradually to a more balanced portfolio approach. We will be providing on top of our outsourcing businesses – or alongside our outsourcing businesses additional, higher-added-value service, be it clouds – we want to put a lot of focus on clouds – application migrations towards the clouds, application modernization, and, in fact, provide more IP for our customers as well.

86.    Nine days later, on September 22, 2011, Hewlett-Packard terminated Apotheker as CEO and announced that defendant Whitman would take over as the new President and CEO of the Company.

87.    On September 22, 2011, Hewlett-Packard hosted a conference call regarding Whitman's appointment as President and CEO. Whitman stated: ". . . the Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year."

88.    On November 21, 2011, Hewlett-Packard conducted its fourth quarter 2011 earnings conference call for analysts and investors. Defendants Whitman and Lesjak participated in the call. During the call, Whitman stated:

[W]e closed the Autonomy acquisition on October 3. In the last month, we've had hundreds of leads passed between the two companies, and we've created a new information management business group that combines Autonomy, Vertica, and other HP software assets under Mike Lynch, and reports directly to me.

                              *        *        *

Well let me just spend a moment on Autonomy. I am really excited about this acquisition. As you all know, I think it really positions HP as a leader in the next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical. *Autonomy is a unique asset.* It has a remarkable ability to manage unstructured information in a way that no one else in the market does. I think *that adds a lot of value not only in their space but actually across HP.*
So, what we've set up is Autonomy is actually running fairly autonomously (laughter) but we have done a great job I think of integrating the go-to market. So, there are sales leads that are going from Autonomy to HP – interestingly, which we didn't expect so much of in terms of a hardware pull-through – but also from our HP sales team back to Autonomy. We've got a clearing house that vets all those leads. So, that what we turn over to Autonomy are really high quality leads that will allow Autonomy to grow much faster than they would have grown on their own. That's the name of the game for 2012.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

There's going to be lots of other things we do together but accelerating the growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012.

89.    During the call, Lesjak stated:

We closed the acquisition of Autonomy in October, and therefore, we had roughly one month of results in the software numbers. The integration is going well thus far, and we are focused on enabling our global sales force to ramp on the Autonomy product line-up, so they can begin selling Autonomy software in fiscal '12.

90.    Whitman also stated the following regarding the Company's Services segment:

First, we increased our investment levels through fiscal-year 2011 because there are areas where HP had previously under-invested. This is a big reason why our services margins have been coming down and remain pressured.

91.    During the fourth quarter 2011 earnings conference call, Lesjak added:

HP services delivered revenue of $9.3 billion, up 2% from the prior year quarter, but down 1% in constant currency. Operating profit of $1.2 billion, or 12.8% of revenue, was down 360 basis points from the prior year. Our services turnaround will take time as we work to shift the business mix toward higher growth, higher margin services. IT outsourcing revenue of $3.9 billion was up 1% year-over-year.

92.    On December 7, 2011, the Individual Defendants caused Hewlett-Packard to file a prospectus on Form 424B5 with the SEC for the offer and sale of $3.0 billion in fixed-rate notes with maturities reaching out to December 9, 2021. The prospectus informed investors that the proceeds of the $3.0 billion offering would be "for general corporate purposes." The December 7, 2011 prospectus incorporated by reference management's discussion and analysis of the Services segment's financial performance during the third quarter of 2011.

93.    On December 14, 2011, Hewlett-Packard filed its 2011 Form 10-K with the SEC. Defendants Whitman, Lesjak and Murrin signed the Form 10-K, which stated in relevant part:

Acquisition of Autonomy Corporation plc

HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012. Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the Autonomy business in the HP Software segment.

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*The acquisition date fair value consideration of $11 billion* consisted of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by HP. In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.

\*       \*       \*

Services net revenue increased 1.2% (decreased 1.3% when adjusted for currency) in fiscal 2011 due to revenue increases in Infrastructure Technology Outsourcing and Technology Services. Infrastructure Technology Outsourcing net revenue increased by 2% in fiscal 2011. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology services net revenue increased by 2% in fiscal 2011, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Applications Services net revenue increased by 1% in fiscal 2011. The increase was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and weakness in public sector spending. Business Process Outsourcing new revenue decreased by 7% in fiscal 2011 due primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

Services earning from operations as a percentage of net revenue decreased by 1.6 percentage points in fiscal 2011. Operating margin decreased due primarily to lower than expected revenue, rate concessions arising from recent contract renewals, a lower than expected resource utilization rate and a higher mix of lower-margin Infrastructure Technology Outsourcing revenue. The decrease in operating margin was partially offset by a reduction in bad debt expense and a continued focus on operating improvements and cost initiatives that favorably impacted the cost structure of both our enterprise services and technology services businesses.

94.     On February 22, 2012, Hewlett Packard conducted its first quarter 2012 earnings conference call for analysts and investors. Defendants Whitman and Lesjak participated in the call. During the call, Whitman stated the following regarding the Company's Services segment:

In Services, *year-over-year revenues were up 1% while operating margin declined to 10.5%.* This continuing margin pressure is Services really goes straight to a couple of our major challenges, like resource utilization and business mix. *We're focused on transitioning to more profitable services* while enhancing our systems, processes and sales force. Last quarter, we characterized Services as a long-term effort. That journey continues.

In Software, with the addition of Autonomy, *revenue grew 30% year-over-year with a 17.1% operating margin.* The Autonomy acquisition is going well. And we're continuing to grow our set of assets from Information Management to our IT Performance Suite including security, management of hybrid clouds

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    and Application Lifecycle Management. Software is a critical part of our
2    portfolio and of our forward-looking strategy.   It amplifies, differentiates,
     optimizes and secures our core infrastructure, builds on our solution capabilities
3    and expands customer relationships.

4    95.    During the first quarter 2012 earnings conference call, Lesjak added:

5    So the performance that we delivered [in Services] was in line with the
     expectations that we set last quarter, and I think that that's an important point.
6    So there shouldn't be any surprises here on that.  Revenues in Services did
     grow 1%, it was flat, on a reported basis it was flat in constant currency while
7    the cost structure increased due to the necessary investments that we've been
     talking about in service delivery, in basically building out our bench and in
8    investing to build out our strategic enterprise services.  And I put – the services
     that we put in that category are services around cloud, analytics and security, as
9    well as apps modernization.  And those are the higher growth, higher margin
     services that we need to invest into and convert this business from being less
10   ITO heavy where the margins are not as good, and in some service lines within
     ITO, the margins are very unattractive and we're deemphasizing some of the
11   revenue in that space.

12   96.    On February 28, 2012, defendant Murrin sold 42,500 shares of his Hewlett-

13   Packard common stock for proceeds of $1.1 million.  Murrin failed in his duty, pursuant to

14   Company policy and the federal securities laws, either to disclose the material adverse facts

15   stated above before selling his stock or to abstain from trading.

16   97.    On March 12, 2012, Hewlett-Packard filed its first quarter 2012 Form 10-Q

17   with the SEC.  Defendants Whitman and Lesjak signed the form 10-Q, which stated in relevant

18   part:

19   Services net revenue increased 1.1% (0.3% when adjusted for currency) for the
     three months ended January 31, 2012 due to revenue increases in Infrastructure
20   Technology Outsourcing and Technology Services.  Infrastructure Technology
     Outsourcing net revenue increased by 2% due to an increase in product-related
21   revenue and a favorable currency impact, the effect of which was partially
     offset by a decline in short-term project contracts with existing clients.  Net
22   revenue in Technology Services increased by 2% due primarily to growth in
     our consulting and support businesses, the effect of which was partially offset
23   by reduced sales of third-party hardware.  Application and Business Services
     net revenue was flat due primarily to a decline in short-term project work, the
24   effect of which was offset by a favorable currency impact.

25   Services earnings from operations as a percentage of net revenue decreased by
     5.7 percentage points in the three months ended January 31, 2012. Operating
26   margin decreased due primarily to rate concessions arising from contract
     renewals, investments in service delivery and sales headcount and additional
27   costs associated with contract deliverable delays.

28

98.    During May 2012, Hewlett-Packard's stock price declined as news leaked out

that results from the Autonomy acquisition were not what the market had been led to believe.

99.    On May 23, 2012, Hewlett-Packard conducted its second quarter 2012 earnings

conference call for analysts and investors.  Defendants Whitman and Lesjak participated in the

call.    During the call, Hewlett-Packard acknowledged that Autonomy had a "very

disappointing" revenue quarter.  Whitman stated:

> To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy
> Officer and Executive Vice President of HP Software, will step in to lead
> Autonomy. Mike Lynch, Autonomy's Founder and Executive Vice President
> for Information Management will leave HP after a transition period.  The
> market and competitive position for Autonomy remains strong, particularly in
> cloud offerings, and we have been flooded with a number of big deal leads.
> Bill is an experienced software leader, who will develop the right processes and
> discipline *to scale Autonomy and fulfill its promise*, although it will take a few
> quarters to see tangible improvement.

100.    During the call, Whitman also stated the following regarding the Company's

Services segment:

> Turning to Services, revenues were essentially flat year-over-year in constant
> currency and we stabilized margins.  While margins may fluctuate quarter-to-
> quarter, we believe that a 10% to 12% range is the right sustainable profit
> margin profile for Services through the remainder of fiscal year 2012.  We're
> focused on building out strategic practice areas, in cloud, security, information
> management, and application transformation.  And we're strengthening the
> industry alignment of our Services business, which will help us better solve
> customer challenges, create more customer value and deepen customer
> relationships. We're excited about growing these higher-margin categories, but
> this is a business that continues to be challenged.  It's a journey, and we have a
> lot of work ahead of us in this turnaround.

101.    On June 8, 2012, Hewlett-Packard filed its second quarter 2012 Form 10-Q

with the SEC.  Defendants Whitman and Lesjak signed the Form 10-Q, which stated in

relevant part:

> Services net revenue decreased 1% (0.3% when adjusted for currency) for the
> three months ended April 30, 2012 and was flat both as reported and in constant
> currency for the six months ended April 30, 2012, respectively.  Application
> and Business Services net revenue increased by 1% and remained flat for the
> three and six months ended April 30, 2012, respectively.  The revenue increase
> was due primarily to an increase in short-term project work as well as an
> increase in sales of cloud offerings, the effect of which was offset by a
> reduction in contract renewals. Technology Services net revenue remained flat
> for the three months ended April 30, 2012.  Technology Services net revenue
> increased by 1% for the six months ended April 30, 2012, due primarily to
> growth in our consulting and support businesses. Infrastructure Technology

1   Outsourcing net revenue decreased by 3% and 1% for the three and six months
ended April 30, 2012, respectively. Lower rates on contract renewals for both
2   periods, along with increased deal selectivity designed to meet threshold
margins for new contracts, contributed to the decrease in revenues.
3

4       102.   On August 8, 2012, the Company announced that it expected to record an $8.0

5   billion goodwill impairment charge within its Services segment due to "recent trading values

6   of HP's stock, coupled with market conditions and business trends within the Services

7   segment." While the market was generally aware that the Company's stock was trading at

8   lower levels and that Hewlett-Packard's competitors within the IT services industry were

9   thriving, defendants continued to leave investors in the dark concerning the details of the

10  collapse in profitability and business prospects of the Enterprise Services business.

11      103.   On August 22, 2012, Hewlett-Packard confirmed in a Form 8-K filed with the

12  SEC that it was indeed taking an $8.0 billion goodwill impairment charge, associated with the

13  Services segment, against third quarter 2012 earnings.

14      104.   The same day, Hewlett-Packard conducted its 3Q2012 earnings conference call

15  for analysts and investors after the close of the trading day. Defendants Whitman and Lesjak

16  participated in the call. During the call, Whitman acknowledged the continuing difficulties

17  with Autonomy, while also concealing important adverse information about Autonomy and

18  Enterprise Services. Whitman stated the following:

19      Now, let me outline some areas where we're not where we need to be. While
Enterprise Services performance in the third quarter was within our
20      expectations, there's still a lot of work that needs to be done. Earlier this month
we announced a change in leadership at ES with Mike Nefkens stepping in to
21      lead on an acting basis. Mike is an experienced leader who has led IT
transformations for a number of our largest accounts.
22

23                          *       *       *

24      Autonomy still requires a great deal of attention and we've been aggressively
working on that business. Among the many changes we've instituted is a
25      global dashboard to track Autonomy's pipeline. A single global sales
methodology, a single HP Services engagement process, and a global process to
26      measure client satisfaction and service delivery progress. These actions are
designed to help deliver predictable results and improve after-sale customer
27      satisfaction.

28      105.   During the call, defendant Lesjak added:

                                    25

Moving on to Services. As we announced on August 8, we are recording a GAAP only non-cash pretax charge of approximately $8 billion for the impairment of goodwill within the Services segment. The impairment stems from the recent trading values of HP stock coupled with market conditions and business trends within the Services segment. We do not expect this goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of the Services segment.

In the third quarter, Services delivered revenue of $8.8 billion, down 3% from the prior year and up 1% in constant currency. Operating profit of $959 million was 11% of revenue, down 2.7 points from the prior year, but still within our expected range of 10% to 12%. The year-over-year decline was due to the unfavorable impact of resource management and account performance and runoff, somewhat offset by an improvement in the cost of Services delivery.

106.    In response to Lesjak and Whitman's disclosure that Autonomy's business was still deteriorating and that Enterprise Services – i.e., the renamed Electronic Data Services or EDS – was the underlying reason for the Services segment's disappointing operating margin performance, the Company's stock price dropped $1.56 per share on August 23, 2012 to close at $17.64 on heavy trading volume. The Individual Defendants, however, still had not fully disclosed how poorly the Enterprise Services business had been performing and its dismal prospects for fiscal 2013.

107.    On September 10, 2012, Hewlett-Packard filed its third quarter 2012 Form 10-Q with the SEC. Defendant Lesjak signed the Form 10-Q, which stated in relevant part:

Services net revenue decreased 3.1% (increased 1.0% when adjusted for currency) and 1.0% (increased 0.4% when adjusted for currency) for the three and nine months ended July 31, 2012, respectively. ITO net revenue decreased by 6% and 3% for the three and nine months ended July 31, 2012, respectively. Contractual rate declines on ongoing contracts, increased deal selectivity designed to meet threshold margins and strategic fit, and an unfavorable currency impact contributed to the decrease in revenues for both the periods. TS net revenue decreased by 1% and remained flat for the three and nine months ended July 31, 2012, respectively. The decrease for the three months ended July 31, 2012 was due primarily to revenue declines in our support business driven by an unfavorable currency impact, the effect of which was partially offset by growth in our consulting business. ABS net revenue remained flat for both the three and nine months ended July 31, 2012, respectively. An increase in sales of cloud and information management and analytics offerings were offset by a reduction in contract renewals as well as unfavorable currency impacts.

Services earnings from operations as a percentage of net revenue for the three and nine months ended July 31, 2012 decreased by 2.7 percentage points and 4.2 percentage points, respectively. Operating margin decreased for both periods due primarily to contractual rate declines on ongoing contracts, a lower

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

resource utilization rate and additional costs associated with certain contract deliverable delays. The decrease in operating margin was partially offset by a continued focus on operating improvements and cost initiatives that favorably impacted the cost structure of both our enterprise services and technology services businesses.

108. During the Company's October 3, 2012 Security Analyst Meeting, Michael Nefkens, Acting Global Enterprise Services Leader, and Jean-Jacques Charhon, Senior VP and COO of Enterprise Services, gave a presentation in which they displayed a PowerPoint slide detailing, "for the first time," the collapse in profitability of the Enterprise Services business. It showed that by August 2011, Enterprise Services' operating margin had already decreased nearly 500 basis points – from 10% to 5% – on $6.0 billion in quarterly revenue. It further revealed that by October 2012, Enterprise Services' operating margin had deteriorated by another 40%, or to 3% on $6.0 billion in quarterly revenue. During the meeting, the Company added that the Services segment's 2013 revenue would slide by 11% to 13% and that operating margins were expected to be in the range of 0% to 3%.

109. In response to these disclosures, the Company's stock price dropped $2.22 – or 13% – on October 3, 2012, on heavy trading volume.

110. The market was stunned at the Company's "first-time" disclosure of the long-running erosion of profits at Enterprise Services. In an October 3, 2012 research report entitled "HP Drops a EPS Bomb for FY13," Topeka Capital Markets noted:

> Most Negative Impact to FY13 EPS to be Enterprise Services.
> Yesterday we talked about the services business being our biggest concern. The biggest driver of YoY EPS decline is HP Enterprise Services, that is expected to negatively impact FY13 EPS by $0.29-$0.35 with sales falling 11%-13% YoY. The operating margin of the Enterprise Services business is expected to be 0% to 3% in FY13 and well below the 11% delivered in 3QFY12. Keep in mind, HP had at one time expected operating margin to be 16% to 17.5% in this business. Given a recent CRN article indicating HP has been trying to sell its Enterprise Services business (and since denied by HP), we believe there was some truth to this article given HP's weak FY13 outlook for this business. Since Enterprise Services was the biggest contributor of profit for HP last quarter . . . this is a long term concern.

## THE TRUTH EMERGES

111. Then, on November 20, 2012, the Company disclosed it was taking an $8.8 billion charge related to its acquisition of Autonomy due to serious accounting improprieties.

27
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In fact, over $5.0 billion of the write-off was necessary due to the fact that Autonomy's financial results were the product of accounting fraud. The Hewlett-Packard release stated in part:

> "HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal. We remain 100 percent committed to Autonomy and its industry-leading technology."

> Additional background:

> HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP. The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

> HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

> HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

> As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

> \*       \*       \*

> This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

112.    USA Today reported on November 20, 2012:

> "The Autonomy revelation is another blow for HP . . . . While the write-down is non-cash, *it may call into question the credibility of its board of directors,*" wrote Shaw Wu, analyst at Sterne Agee & Leach, to a note to clients.

\*     \*     \*

Additionally, Whitman has "highlighted she was comfortable and confident in the deal," says Aaron Rakers, analyst at Stifel. "Given she was on the board when the Autonomy deal was done, I'm not sure if it's a reflection on her, but another ding against the board."

The $8.8 billion financial charge is nearly as large as the $10.2 billion HP paid for the company.

113. On this news, the Company's stock price dropped $1.59 per share during the day to close at $11.71, a decline of 12%, on volume of 155 million shares.

114. The true facts, which were known by Lesjak, Whitman, Murrin, and Apotheker but concealed from the investing public during the Relevant Period, were as follows:

115. At the time Hewlett-Packard acquired Autonomy, the business's operating results and historic growth were the product of accounting improprieties, including among other manipulations the mischaracterization of sales of low-margin hardware as software and the improper recognition of revenue on transactions with Autonomy business partners even where customers did not purchase the products.

116. During the same period, the Individual Defendants concealed from the investing public the facts that HP's Enterprise Services unit, the former EDS acquisition, had seen operating margins collapse from 10% in 2010 to approximately 6% as of April 30, 2011, 4% as of October 31, 2011, and 3% as of April 30, 2012, due to reasons including unfavorable revenue mix and underperforming contracts.

117. As a result of Lesjak, Whitman, Murrin, and Apotheker's false and misleading statements, Hewlett-Packard common stock traded at artificially inflated prices during the Relevant Period. However, after the above-alleged revelations of the true but undisclosed facts seeped into the market, the Company's common stock experienced exorbitant selling pressure sending its price down 60% from its Relevant Period high.

118. Throughout the Relevant Period following the acquisition, Autonomy's financial results were reported through Hewlett-Packard's Software segment.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

119.    Defendant Schultz, HP's General Counsel, stated that there had been "no problems" with HP financial statements since the acquisition and "no material weakness" in HP's control processes in connection with accounting for revenues generated by Autonomy.

120.    If the fraudulent revenue recognition methods were discovered immediately after the acquisition was consummated, however, this should have been disclosed to investors at the earliest opportunity, which they clearly were not.  And if the allegedly fraudulent revenue recognition methods were not discovered until just recently, then these fraudulent accounting methods continued and propagated through HP's financial statements for nearly a year – clearly a material weakness in control processes, as well as fraudulent reporting to investors and authorities.

121.    Defendants' prior public statements regarding Autonomy, HP's business strategy, and HP's financial prospects based on that acquisition were each improper when made because they failed to disclose and misrepresented any of the material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing, as described herein.

## FURTHER CORPORATE WASTE

122.    During the period that the Individual Defendants were making misleading and improper statements that artificially inflated the Company's stock price, Defendants directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

123.    During August 2011, HP was buying back its own shares at $31.51 per share. In FY 2012, HP used over $1.6 billion to repurchase 66.6 million shares at an average cost of $24.46 per share. The shares now trade at $12.75 per share, for a loss of $820 million to the Company.

124.    The Defendants knew, or recklessly disregarded the facts, that the Company's share price was inflated due to the recent misleading positive statements, and knew or should have known similarly that there would be a drastic correction when the bad news was revealed. Defendants must have known that these developments would cause the Company's stock to

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   tumble. Nevertheless, these Defendants allowed the Company to deplete its assets by paying

2   large premiums to repurchase its own stock, fully aware that the imminent announcement of

3   known developments would cause the Company's stock to drop significantly.

4                                   **DEFENDANTS' ACTIONS DAMAGED HP**

5          125.    As a result of the Individual Defendants' various improprieties, HP

6   disseminated false and misleading public statements and committed massive corporate waste.

7   HP's reputation, for technical excellence, for reliability, and for truthfulness, has suffered

8   greatly. Adding to the enormous amount of financial damage the Company has already

9   incurred, HP is now the subject of numerous securities fraud class actions.

10         126.    As a direct and proximate result of the Individual Defendants' actions, HP has

11  expended, and will continue to expend, significant sums of money.  Such expenditures include,

12  but are not limited to:

13         a.      costs incurred from overpaying for its own stock at artificially inflated prices;

14         b.      the write down of $8.8 billion, $5 billion of which HP attributed directly to

15  having overpaid for its acquisition of Autonomy and the remainder attributed to declines in

16  goodwill and other intangibles associated with HP's share value subsequently;

17         c.      costs incurred from compensation and benefits paid to the defendants who

18  breached their duties to HP;

19         d.      costs incurred from hiring, compensating, and terminating an unvetted and

20  unqualified Chief Executive in Defendant Apotheker; and

21         e.      costs incurred from defending and paying any settlement in the class actions for

22  violations of federal securities laws.

23         127.    Moreover, the Individual Defendants' actions have irreparably damaged HP's

24  corporate image and goodwill.  For at least the foreseeable future, HP will suffer from what is

25  known as the "liar's discount," a term applied to the stocks of companies who have been

26  implicated in improper behavior and have misled the investing public, such that HP's ability to

27  raise equity capital or debt on favorable terms in the future is now impaired.

28

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

128. Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of HP, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of HP's Board.

129. The Individual Defendants breached their duty of loyalty and good faith by disseminating false and misleading statements about the Company's financial status, strategic plans, the actual value of and liabilities associated with the Autonomy acquisition, and by allowing other Defendants to do so.

130. Those Director Defendants that voted to select Apotheker as CEO of HP, without taking care to meet him or ascertain what his plans for the Company would be once he became CEO, breached their duty of loyalty and good faith by refusing to inform themselves adequately about this crucial information when such information was readily available.

131. The Individual Defendants also breached their duty of loyalty and good faith by causing the Company to dramatically overpay for its own stock at the same time the Company's stock was inflated due to the improper statements detailed herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, HP has expended, and will continue to expend, significant sums of money.

**NO SAFE HARBOR**

132.    The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Forward-looking statements, if any, were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, the Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the specific forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of HP who knew that those statements were false when made.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

133.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

134.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of HP, regarding the Individual Defendants' management of HP's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at HP and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

33
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

135.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

136.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

137.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

138.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

139.    Plaintiff brings this action derivatively in the right and for the benefit of HP to redress injuries suffered, and to be suffered, by HP as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. HP is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.    Plaintiff will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights.

141.    Plaintiff was a shareholder of HP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently an HP shareholder.

142.    HP's Current Directors as of the filing of this action consists of the following eleven individuals: defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, and Whitman.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

143.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman's decision to authorize the $10.2 billion acquisition of Autonomy is not protected by the business judgment rule.  At the time of this decision, these defendants were at a minimum grossly negligent in authorizing a massive acquisition price -- $10.2 billion – for an acquisition that the Company would, within a year, incur an associated $8.8 billion write-off, due to accounting improprieties that would have been obvious and with reasonable diligence should have been uncovered before they committed HP to the disastrous acquisition.

144.    Further, at the same time that these Defendants authorized and allowed the Company to continue to purchase its stock at artificially inflated prices, these Defendants were aware or with the exercise of ordinary care should have been aware that the stock was drastically overpriced.  In fact, HP acquired over $2 billion of its own stock, at the same time that the Individual Defendants, including the Board, knew that the acquisition of Autonomy was seriously flawed and that the acquisition would not provide anything close to the return on investment that the Individual Defendants had promised investors. Such reckless conduct is at a minimum a breach of the Board's duty of care.  Accordingly, the Board's decision to authorize the repurchase is not protected by the business judgment rule.

35

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Demand Is Excused Because The Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**

145.    The Current Board also faces a substantial likelihood of liability, for violation of section 20(a) of the Exchange Act, because they had the power and ability to control and prevent the dissemination of the foregoing false and misleading statements. These defendants allowed such statements to be made and to influence the market, which had the effect of artificially inflating the value of the Company's stock. These defendants' failure to exercise proper control over the Company's public disclosures caused the Company to repurchase $2 billion of its own stock at inflated prices.

146.    In particular, defendants Andreeseen, Gupta, Reiner, Russo, and Whitman, as members of the Technology Committee, were directly responsible for knowing the status of the Company's acquisitions, including its acquisition of Autonomy. These defendants, therefore, knew that the acquisition of Autonomy was a failed strategy, brought about by negligent diligence and possible accounting fraud.

147.    In addition, defendants Banerji, Gupta, and Thompson served on the Company's Audit Committee, and therefore, had a responsibility and obligation to review and discuss HP's public filings with the U.S. Securities and Exchange Commission ("SEC"), including the misleading statements described herein. Accordingly, Apotheker, Andreesssen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman face a substantial likelihood of liability for violations of federal securities law and demand upon them is futile.

148.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman also face a substantial likelihood of liability for wasting the Company's assets. Each of these defendants authorized and failed to halt HP's $2 billion repurchase of its own stock. At the same time that Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman authorized and refused to halt the repurchase, they knew the non-public inside information concerning the Company's acquisition of Autonomy and the wide disparity between the value of that

36
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    company's revenues the purchase price had been based upon and the actual financial
2    performance of the unit. No reasonable person would have paid the price that these defendants
3    caused the Company to pay for HP stock if they possessed the non-public information these
4    Defendants had. Accordingly, Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore,
5    Reiner, Russo, Thompson, and Whitman are liable for the amount that the Company wasted
6    and a demand as to these defendants would be futile.

7         149.   Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore,
8    Reiner, Russo, Thompson, and Whitman also face a substantial likelihood of liability for
9    making and allowing the other Individual Defendants to continue to make improper statements
10   about the Company's financial status. Each of these defendants knew, or in reckless disregard
11   for their fiduciary duties, should have known about the financial performance of HP's
12   Autonomy acquisition and the declining margins in its former EDS unit. Nevertheless,
13   Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and
14   Whitman either participated in or allowed the improper statements to continue.

15        150.   Further, a majority of the Board is not independent of Defendant Lane. Lane
16   was instrumental in nominating Apotheker to be the CEO of HP. Lane and Apotheker then
17   personally selected five new directors to serve on the Board: defendants Banerji, Reiner,
18   Russo, Senequier, and Whitman. Of these, four are still directors. In playing a direct role in
19   selecting these four directors, Lane and Apotheker usurped the role of the Board's Nominating
20   and Governance Committee in evaluating and considering potential Board members.
21   Nevertheless, the Board took no action to reprimand Lane or include the Nominating and
22   Governance Committee in the selection of new Board members. Rather, defendants Lane and
23   Apotheker personally called defendants Banerji, Reiner, Russo, Senequier, and Whitman and
24   invited them to the Board. The Current Board has demonstrated it will not take action to
25   censure or penalize Lane, who faces a substantial likelihood of liability for the conduct
26   described above, let alone vote in favor of initiating action against him. Accordingly, a
27   reasonable doubt is raised regarding whether the Board can independently consider a demand.
28

151.   In addition, Lane has known defendant Apotheker since the 1990s when Lane previously hired Apotheker. Lane has admitted to having a close relationship with Apotheker. Indeed, in his short time at HP, Lane used his influence with Apotheker to benefit Lane's position as managing partner of Kleiner Perkins Caufield & Byers ("Kleiner Perkins"), a venture capital investment firm. In February 2011, HP acquired Vertica Systems, a Kleiner Perkins investment. Lane had personally sponsored Kleiner Perkins investment in Vertica Systems. A demand on Lane to initiate an investigation implicating both Apotheker and Lane would be a futile act.

152.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by HP's officers and directors and these acts are incapable of ratification.

153.   Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

154.   HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and Current Board have not filed any lawsuits against any Defendants who were responsible for that wrongful conduct, to attempt to recover for HP any part of the damages HP suffered and continues to suffer thereby.

155.   HP's current and past officers and directors are anticipated to have directors' and officers' ("D&O") liability insurance provided by HP. However, D&O liability insurance policies almost uniformly contain provisions that eliminate coverage for any action brought directly between insureds, known as the "insured versus insured exclusion." As a result, if these directors were to cause HP to sue themselves or certain of the officers of HP, they would forfeit the protection of their directors' and officers' policies. If the suit is brought derivatively, as this action is brought, such insurance coverage will provide the means for the Company to effectuate recovery. Defendant Directors are considered unlikely to cause HP to

38

sue themselves as, whether or not they maintain D&O coverage, they would face a large uninsured liability without recourse to indemnification.

156.   Even though the Individual Defendants have had full knowledge of the claims and causes of action raised by plaintiff and time to act on that knowledge, the Board has failed to seek to recover for HP for any of the wrongdoing alleged.

157.   Plaintiff has not made any demand on the other shareholders of HP to institute this action since such demand would be a futile and useless act for at least the following reasons:

- HP is a publicly held company with nearly 2 billion shares outstanding and thousands of shareholders;

- making demand on such a number of shareholders would be impossible for plaintiff who has no reasonable way of finding out the names, addresses, or phone numbers of all shareholders; and

- making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Apotheker, Lesjak, Whitman, and Murrin for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

158.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.   Defendants, Apotheker, Lesjak, Whitman and Murrin, knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of the Company and its business prospects in connection with both the Autonomy acquisition and the performance of the Company's former EDS acquisition.

160.   The Director Defendants contemporaneously caused HP to repurchase over $2 billion worth of its own stock at artificially inflated prices caused by the false and misleading statements.

161.   The wrongful conduct alleged herein was continuous, connected, and on-going and resulted in continuous, connected, and on-going harm to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      162.   The Individual Defendants violated section 10(b) of the Exchange Act and

2   SEC Rule 10b-5 promulgated thereunder in that they:

3          - employed devices, schemes, and artifices to defraud;

4          - made untrue statements of material facts or omitted to state material facts necessary in
       order to make the statements made, in light of the circumstances under which they
5       were made, not misleading; or

6          - engaged in acts, practices, and a course of business that operated as a fraud or deceit
7       upon HP stock.

8      163.   HP has suffered damages by repurchasing the Company's stock at prices that

9   these defendants knew were artificially inflated as a result of the false and misleading

10   statements. But for these defendants' misconduct, the Company would not have purchased its

11   stock at the prices it paid.

12

13                              **COUNT II**

14   **Against the Director Defendants for Violation of Section 20(a) of the Exchange Act**

15      164.   Plaintiff incorporates by reference and realleges each and every allegation

16   contained above, as though fully set forth herein.

17      165.   The wrongful conduct alleged herein was continuous, connected, and on-going

18   during the relevant period from the first improper statement until November 20, 2011, when

19   the truth was revealed.   The Director Defendants' misconduct resulted in continuous,

20   connected, and on-going harm to the Company.

21      166.   The Director Defendants had the power and/or ability to, and did, directly or

22   indirectly control or influence the Company's general affairs, including the content of public

23   statements disseminated by HP and the timing and amount of stock repurchases, and had the

24   power and/or ability directly or indirectly to control or influence one another and those

25   defendants whose specific conduct violated section 10(b) of the Exchange Act and SEC Rule

26   10b-5 promulgated thereunder as alleged above.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      167.    Each of these defendants is jointly and severally liable under section 20(a) of

2   the Exchange Act for the primary violations of section 10(b) and Rule 10b-5 promulgated

3   thereunder, as set forth herein. These Defendants did not act in good faith.

4
5                                      **COUNT III**

6              **For Breach of Fiduciary Duty Against the Individual Defendants**

7      168.    Plaintiff incorporates by reference and realleges each and every allegation

8   contained above, as though fully set forth herein.

9      169.    As alleged in detail herein, the Individual Defendants by reason of their

10  positions as officers and directors of HP and because of their ability to control the business and

11  corporate affairs of HP, owed the Company fiduciary obligations of due care and loyalty, and

12  were and are required to use their utmost ability to control and manage HP in a fair, just,

13  honest, and equitable manner.

14     170.    Defendants Apotheker, Lesjak, and Whitman violated their duty of care by

15  making improper statements in the Company's press releases, conference calls, and other

16  public disclosures, and the remaining Individual Defendants breached their duty of care by

17  allowing those statements to be made and not corrected. These Defendants were reckless or

18  grossly negligent in making and allowing statements that concealed material facts from

19  investors. In light of the factual allegations above regarding the Autonomy acquisition and

20  EDS performance, these Individual Defendants had no reasonable basis to make or allow

21  positive statements about HP's financial results and business prospects.

22     171.    Those Director Defendants who elected Léo Apotheker as CEO of HP, without

23  taking due care for the Board to meet him or inform themselves about his competence,

24  suitability, or plans for their company, when such information was readily available, violated

25  their fiduciary duty of due care and loyalty to use their utmost ability to control and manage

26  the Company.

27     172.    The Director Defendants further breached their duties of loyalty and due care

28  by allowing the acquisition of Autonomy at a grossly inflated price, without conducting or

                                            41
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    requiring effective due diligence, such that the Company suffered an $8.8 billion write down a

2    year after they caused the Company to invest $10.2 billion in that acquisition.

3        173.    The Director Defendants further breached their duty of loyalty by allowing the

4    Company's stock repurchase program to continue and allowing the Company to execute a

5    repurchase of approximately $2 billion of the Company's stock at prices they knew, or in

6    reckless disregard of their duties did not know, were artificially inflated.

7        174.    The Audit Committee Defendants breached their fiduciary duty of loyalty by

8    knowingly or recklessly allowing the Company to make improper statements in its public

9    filings, press releases, and earnings conference calls concerning the Company's financial

10    health, business prospects, and forward guidance.

11        175.    Both the Finance and Investment Committee Defendants and the Technology

12    Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly

13    allowing the Company to complete the proposed acquisition of Autonomy, ignoring abundant

14    red flags and without performing or requiring adequate due diligence. These Defendants knew

15    or with the exercise of reasonably diligence should have known that Autonomy's financial

16    metrics were seriously flawed if not plainly fraudulent.

17        176.    As a direct and proximate result of the Individual Defendants' foregoing

18    breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

19        177.    Plaintiff, on behalf of HP, has no adequate remedy at law.

20

21                        **COUNT IV**

22       **Against the Individual Defendants for Waste of Corporate Assets**

23        178.    Plaintiff incorporates by reference and realleges each and every allegation

24    contained above, as though fully set forth herein.

25        179.    The Director Defendants, save Apotheker, wasted corporate assets by failing to

26    exercise due care in the hiring process for Apotheker as HP's CEO.

27        180.    The Director Defendants further wasted corporate assets by allowing the

28    acquisition of Autonomy at a grossly inflated price without conducting adequate due diligence.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

181.   The Individual Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of HP's executive officers and directors, by knowingly authorizing and implementing the buyback of HP common stock at artificially inflated prices, and by exposing HP to civil liability, causing the Company to incur potentially millions of dollars in legal costs.

182.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

183.   Plaintiff, on behalf of HP, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

184.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.   At the time of the Company's false and misleading statements and all relevant times stated herein, the Individual Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from HP in breach of their fiduciary duties. Defendants were unjustly enriched thereby.

187.   In addition, those Defendants who sold HP shares while in possession of material, adverse, non-public information, and specifically Defendant Murrin, enriched themselves at the expense of the investors in HP to whom they sold and the investing public.

188.   To remedy the Individual Defendants' unjust enrichment, this Court should order all Defendants so enriched to disgorge all proceeds the Individual Defendants received from their bonuses, stock options, and insider selling.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT VI**

**Against the Financial Advisor Defendants for Negligence**

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    The Financial Advisor Defendants occupied a position of influence and confidence with respect to HP in the Autonomy acquisition, profited handsomely from that transaction, and had a duty therefore to advise HP through and by the exercise of professional competence in those roles.

191.    The Financial Advisor Defendants, each and severally, failed to carry out these responsibilities, failing to note or to bring to HP's attention the abundant red flags regarding Autonomy's accounting and finances. Instead, these Defendants encouraged the consummation of the transaction and pocketed their fees.

192.    These Defendants therefore breached their duties of care and violated the confidence placed in them. Those breaches proximately caused HP to suffer damages in completing the Autonomy acquisition at a grossly inflated price, directly leading to HP's write-down of $8.8 billion in connection with that acquisition.

193.    Plaintiff, on behalf of HP, has no adequate remedy at law.


**COUNT VII**

**Against Defendant Lynch and Financial Advisor Defendants, Aiding and Abetting**

194.    Defendant Lynch, and each of the Financial Advisor Defendants, are liable for aiding and abetting the above violations of fiduciary duties and violations of law.

195.    Lynch was directly responsible for and had personal knowledge of the accounting improprieties at Autonomy that led to the over-valuation of the company in HP's acquisition.

196.    The Financial Advisor Defendants either actually knew, or by exercise of reasonable professional diligence should have known that those improprieties would cause HP to grossly overvalue Autonomy as an acquisition candidate.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

197.   By concealing the actual state of Autonomy's finances, Defendant Lynch and the Financial Advisor Defendants aided and abetted in the acquisition of Autonomy by HP at a gross overvaluation, and all benefitted thereby. Lynch was overcompensated for his ownership stake in Autonomy, and the Financial Advisor Defendants all received substantial fees in connection with the acquisition, both to HP's detriment.

198.   Plaintiff, on behalf of HP, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of HP, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing HP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.   a proposal to strengthen the Company's oversight and controls over its stock repurchase program;

2.   a proposal to strengthen the Company's controls over public disclosures;

3.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.   a provision to permit the shareholders of HP to nominate at least three candidates for election to the Board;

5.   a proposal to strengthen the Board's supervision of the Company's financial reporting process, including the internal audit and control functions;

6.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

7.    a proposal to formalize the qualification process for HP's directors and C-level executives; and,

8.    a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of HP has an effective remedy;

D.    Awarding to HP restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully Submitted,

Dated: December 3, 2012                    By: _____
                                                Brett Weaver

                                           JOHNSON & WEAVER, LLP
                                           Frank J. Johnson
                                           Brett Weaver

                                           110 West "A" Street, Ste. 750
                                           San Diego, California 92101
                                           Telephone: (619) 230-0063
                                           Facsimile: (619) 255-1856

                                           *Attorneys for Plaintiff*

46
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Martin Bertisch, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint ("Complaint"), and that I have authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 29th day of November, 2012.

By: _Martin Bertisch_